In the Matter of Dennis HIEMER, Debtor.

MERCANTILE BANK, Plaintiff,

v.

Dennis HIEMER, Defendant.

Bankruptcy No. BK93–40944.
Adv. No. A94–4016.

United States Bankruptcy Court,
D. Nebraska.

July 3, 1995.

Drew Frackowiak, Overland Park, KS, for Mercantile Bank.

Casey Quinn, Omaha, NE, for debtor.

## MEMORANDUM

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

Before the court is the Adversary Proceeding to Determine Dischargeability of Debt pursuant to 11 U.S.C. § 523(a)(2)(A). Mer-

cantile Bank asserts that the charges made by the debtor on his Mercantile Bank credit card account should be determined nondischargeable because the debtor knew or should have known at the time the charges were made that he could not repay the amounts charged. I reject this argument, and conclude that the credit card debts are not excepted from discharge.

## FINDINGS OF FACT

The debtor, Dennis Hiemer, filed Chapter 7 bankruptcy on August 6, 1993. At the time of filing bankruptcy, the debtor had approximately $57,000.00 in unsecured debt, all of which was charged to credit cards. Besides the Mercantile Bank card at issue in this case, the debtor has approximately seventeen other credit cards, thirteen of which are Bank cards. Of these seventeen other credit card accounts, the majority were issued between ten and thirty years before the bankruptcy filing. The debtor had never defaulted on these other credit cards, and none of the other credit cards had ever been revoked. The debtor consistently made minimum monthly payments when due, and used these other credit cards to pay his over-the-road expenses and supplement his monthly income. The debtor is a truck driver.

The credit card at issue in this case, account number 5151–2040–0053–9860, was issued by Mercantile Bank to the debtor in late January or early February of 1993, approximately six months before the bankruptcy filing. The Mercantile Bank card was issued as the result of a solicitation letter sent to the debtor by Mercantile Bank in late December of 1992, indicating that Mr. Hiemer had been pre-approved for a Mastercard with a credit limit of $2,000.00. The debtor had not previously done business with Mercantile Bank, but returned the letter, indicating his acceptance of the card. Mercantile Bank performed a credit rating analysis on Mr. Hiemer based on a point system, and approved Mr. Hiemer for a $2,000.00 credit limit. At the time of the application, Mr. Hiemer was earning $19,000.00 to $21,000.00 a year as a truck driver, and possessed seventeen other credit cards, thirteen of which were bank cards. Prior to 1989, Mr. Hiemer

was a farmer. Mr. Hiemer was forced to sell his farm equipment and seek other employment as a result of debt owed on the farm business.

Approximately $1,900.00 in charges were made by Mr. Hiemer on the Mercantile Bank account between February and August of 1993, and the entire unpaid balance is alleged to be nondischargeable. Specifically, the debtor took two cash advances of $200.00 during April, and made 22 purchases between February and the end of July totaling $1,535.40. The debtor used the cash advances to meet his basic living expenses and to pay bills. The majority of the purchases involved over-the-road expenses of the debtor while hauling freight, such as truck washing costs and hotel stays, except for a few charges for discretionary items. At no time prior to bankruptcy did the debtor ever exceed the $2,000.00 credit limit on the Mercantile Bank card. The last purchase made by the debtor on the Mercantile Bank card was on July 1, 1993. The last payment made by the debtor was a $110.00 payment on July 29, 1993. It appears that the debtor remained current on his monthly payments on the Mercantile Bank card until filing bankruptcy. The debtor first contacted an attorney about filing bankruptcy in late July or early August of 1993. There is no evidence that the debtor made any charges or obtained any cash advances on his Mercantile Bank account in contemplation of filing bankruptcy.

At the time of filing bankruptcy, the debtor was living on land owned by his uncle. The debtor's income was approximately $1,300.00 per month, and his monthly expenses were $1,223.00 per month. (See Schedule I of Bankruptcy Schedules). At the time of the charges in question, the debtor believed he would be able to repay these amounts based on an expected improvement in the cattle hauling business, his ability and willingness to work a second job, and his hope of obtaining a raise in his wages.

## LAW

Counsel for Mercantile Bank asserts that the credit card debt owed to Mercantile Bank on account number 5151–2040–0053–9860 is

nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) provides that a debt for money, credit, property, or services will be excepted from discharge if it is obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition...." 11 U.S.C. § 523(a)(2)(A) (1995).

Notwithstanding the apparent clarity of this section, ambiguity results when it is applied to credit card cases. The cause of this ambiguity is the nature of credit card transactions. Although there may well be credit card cases under § 523(a)(2)(A) involving express written or verbal representations, such as a written misrepresentation on a card application, generally this is not the case. When a cardholder makes a purchase or obtains a cash advance, the cardholder is usually not dealing with the credit card issuer directly, but rather with a third party. Therefore, a verbal or written representation is not expressly made to the credit card company at the time of a credit card purchase or charge is made.

As a result of this conceptual difficulty, there exists considerable disparity in the decisional law in regard to the analytical structure for determining whether a credit card debt is excepted from discharge pursuant to § 523(a)(2)(A). Given the lack of an actual verbal or written representation by the cardholder, there exists no realistic basis for determining that the cardholder engaged in "false pretenses" or "false representations", and courts who choose to analyze credit card cases as such are forced to engage in the fiction of an implied representation of an intent to repay upon the use of the credit card. The judicial fiction of an implied representation allows a court to analyze § 523(a)(2)(A) credit card transactions by reference to decisional law in cases where there was an actual, expressed fraudulent representation.

However, I conclude that a resort to the fiction of an implied representation, and the resultant application of the theories of false pretenses and false representations, is unnecessary in credit card cases. I reach this conclusion because there is an alternative, more direct way to approach the problem through the application of a theory of actual fraud. Pursuant to § 523(a)(2)(A), a debt is determined nondischargeable if it arises from "false pretenses, a false representation, or *actual fraud.*" 11 U.S.C. § 523(a)(2)(A) (1995) (emphasis added). Under the decision of *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988), adopted by this court in *Matter of Troutman,* 170 B.R. 156 (Bankr.D.Neb. 1994), it was established that in order to hold a credit card debt nondischargeable under § 523(a)(2)(A), a creditor must show "actual fraud" on the part of the debtor—namely that the debtor did not intend to repay the charges at the time such charges were made. *In re Dougherty,* 84 B.R. at 656–57.

The court in *In re Dougherty* held that various factors of circumstantial evidence may be considered in determining a debtor's intent. *Id.* at 657. These factors are as follows:

1. The length of time between the charges made and the filing of bankruptcy;
2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
3. The number of charges made;
4. The amount of the charges;
5. The financial condition of the debtor at the time the charges are made;
6. Whether the charges were above the credit limit of the account;
7. Whether the debtor made multiple charges on the same day;
8. Whether or not the debtor was employed;
9. The debtor's prospects for employment;
10. The financial sophistication of the debtor;
11. Whether there was a sudden change in the debtor's buying habits; and
12. Whether the purchases were made for luxuries or necessities.

*In re Dougherty,* 84 B.R. at 657.

I conclude that the approach of *In re Dougherty,* which avoids the fiction of an

348

implied representation, is the preferable approach in § 523(a)(2)(A) credit card cases, and will accordingly apply this analysis, with its various factors, to the case currently before the court.

### DISCUSSION

■ Counsel for Mercantile Bank asserts that the entire unpaid balance of credit card debt owed it by the debtor should be determined nondischargeable because, as a result of the debtor's financial condition, the debtor knew or should have known that he could not repay the amounts charged. In essence, counsel for Mercantile Bank asserts that the financial condition of the debtor at the time the charges were made should be the controlling factor in the court's analysis, and that the court should conclusively presume actual fraud on the part of the debtor. I decline to accept this position. While the financial condition of the debtor at the time the charges were made is a relevant factor, I conclude that it is only one of numerous factors to be considered by the court, and it is not decisive on the issue of intent. It is important that courts soundly reject the proposed conclusive presumption arising from an objective inability to repay debt because its adoption would bestow upon the issuers of credit cards an unheralded bankruptcy preference. The fact is that nearly all bankruptcy debtors are hopelessly insolvent and have incurred debt at a time when they had an objective inability to pay. The first defense to such credits by a lender is sound loan underwriting. Where a lender finds itself in bankruptcy, its debt should not be excepted from discharge on the simple theory that the debtor had an inability to repay the debt at the time the debt was incurred. Such a presumption would discourage prudent underwriting by lenders because in bankruptcy the lenders' debt would be nondischargeable. A debtor's insolvency is simply a factor to be considered in determining whether or not the debtor intended to repay a debt. Insolvency should not result in a conclusive presumption that a debtor lacked the requisite intent to repay a debt. As in the law of fraudulent conveyances, insolvency is an *indicia* of fraud; it does not create a presumption of fraudulent intent.

■ After applying the factors of *In re Dougherty* to the facts of this case, I conclude that the debtor intended to repay the amounts charged at the time the charges were made. The charges in issue occurred over a five month period, which ended approximately a month before the bankruptcy was filed. In addition, there were numerous charges involved, some of which occurred on the same day or were within close proximity, and all of the charges were made at a time when the debtor was in financial difficulties. However, I conclude that these factors are counter balanced by the other factors of *In re Dougherty*.

The debtor did not consult an attorney about filing bankruptcy until nearly a month after making his last purchase on the Mercantile Bank card. In addition, the debtor never exceeded the credit limit on the Mercantile Bank card and continued to make minimum monthly payments even after his last use of the card and until immediately before filing bankruptcy. The debtor was gainfully employed at the time the charges were made, and was working extensive hours on the road. He was also attempting to work side jobs when possible to supplement his income. The debtor was not financially sophisticated. There was no sudden change in the debtor's buying habits, although the debtor's use of credit increased somewhat prior to bankruptcy, as the debtor used the Mercantile Bank card in similar fashion to the other credit cards he had maintained for numerous years. Finally, the vast majority of the charges involved were for necessary expenses during the debtor's travel for work or to meet daily living expenses, rather than for luxury items of personal enjoyment. Therefore, it does not appear that the debtor was attempting to deceive Mercantile Bank in the use of his credit card or to manipulate his credit improperly.

■ Finally, I note that the argument of Mercantile Bank as to the financial condition of the debtor appears somewhat misplaced given the context of this case. The credit card in question was issued only six months prior to bankruptcy, at a time when the debtor's financial situation was basically the same as it was at the time of the bankruptcy

filing. Despite the debtor's extensive credit card debt on his seventeen other credit cards, Mercantile Bank solicited the debtor with a pre-approved credit limit of $2,000.00 and approved the debtor after a preliminary credit check. The debtor at no time exceeded the credit limit which he was authorized to use. Interestingly, at about the same time as the debtor was approved for a credit card by Mercantile Bank, the debtor was turned down by General Motors for a pre-approved credit card. This is not to say that the practices of Mercantile Bank are unusual or unacceptable from a business standpoint. However, I conclude that Mercantile Bank can not now take advantage of its own procedures to obtain a per se determination of nondischargeability based upon an objective inability to repay. This is particularly true where the inability to pay existed at the time the credit card was issued and there was no misrepresentation or fraud in connection with issuance of the card.

A separate order shall be entered holding that the credit card debts at issue in this case are dischargeable.